# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| MONTE LEGER, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| TAKATA CORPORATION, TK HOLDINGS, INC., HIGHLAND INDUSTRIES, INC., HONDA MOTOR CO., LTD., and AMERICAN HONDA MOTOR CO., INC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NATURE OF CLAIM ................................................................................................................ 1

JURISDICTION AND VENUE ............................................................................................... 10

THE PARTIES ......................................................................................................................... 11

FACTUAL ALLEGATIONS .................................................................................................. 12

TOLLING OF THE STATUTE OF LIMITATIONS ............................................................. 26

    Fraudulent Concealment .............................................................................................. 26

    Estoppel........................................................................................................................ 27

    Discovery Rule............................................................................................................. 27

CLASS ACTION ALLEGATIONS ....................................................................................... 28

CLAIMS FOR RELIEF .......................................................................................................... 35

    FIRST CLAIM FOR RELIEF Violation of the Magnuson-Moss Warranty Act
        15 U.S.C. §§ 2301 *et. seq.* (Brought on behalf of the Nationwide Class
        against all Defendants)....................................................................................... 35

    SECOND CLAIM FOR RELIEF Fraud by Concealment (Brought on behalf
        of the Nationwide Class against all Defendants) ................................................ 40

    THIRD CLAIM FOR RELIEF Violation of the Racketeer Influenced and
        Corrupt Organizations Act (RICO) 18 U.S.C. §§ 1961-1968 (Brought
        on behalf of the Nationwide Class against all Defendants) ................................. 42

    FOURTH CLAIM FOR RELIEF Fraud, Deceit, and Concealment  Cal. Civil
        Code §§ 1709, 1710, 1711  (Brought on behalf of the Nationwide
        Class against the Honda Defendants) .................................................................. 56

    FIFTH CLAIM FOR RELIEF Violation of the Consumer Legal Remedies Act
        Cal. Civil Code § 1750 *et seq.* (Brought on behalf of the Nationwide
        Class against the Honda Defendants) .................................................................. 57

    SIXTH CLAIM FOR RELIEF Violations of the California Unfair
        Competition Law Cal. Bus. & Prof. Code § 17200, *et seq.* (Brought on
        behalf of the Nationwide Class against the Honda Defendants)......................... 65

    SEVENTH CLAIM FOR RELIEF Violation of the California False
        Advertising Law Cal. Bus. & Prof. Code § 17500, *et seq.* (Brought on
        behalf of the Nationwide Class against the Honda Defendants)......................... 68

    EIGHTH CLAIM FOR RELIEF Negligent Failure to Recall (Brought on
        behalf of the Nationwide Class against the Honda Defendants)......................... 70

    NINTH CLAIM FOR RELIEF Violations of the Texas Deceptive Trade
        Practices — Consumer Protection Act Tex. Bus. & Com. Code
        §§ 17.41, *et. seq.* (Brought on behalf of the Texas Class against all
        Defendants) ......................................................................................................... 71

- i -

**TABLE OF CONTENTS**
**(continued)**

**Page**

TENTH CLAIM FOR RELIEF Breach of the Implied Warranty Of
    Merchantability  Tex. Bus. & Com. Code § 2.314) (Brought on behalf
    of the Texas Class against all Defendants) ........................................................... 77

ELEVENTH CLAIM FOR RELIEF Fraud by Concealment (Brought on
    behalf of the Texas Class against all Defendants) .............................................. 78

PRAYER FOR RELIEF ............................................................................................. 79

DEMAND FOR JURY TRIAL ................................................................................... 82

1207355.1

## NATURE OF CLAIM

1.      Plaintiff Monte Leger brings this action individually and on behalf of all persons similarly situated who purchased or leased Defective Vehicles (defined below) manufactured, distributed, or sold by the Vehicle Manufacturer Defendants (defined below) that contain airbags manufactured by Defendant Takata (defined below), for claims under federal and state law. Plaintiff alleges as follows, based on personal knowledge, and upon information and belief as to all other matters:

2.      As used in this Complaint, "Defective Vehicles" refers to all vehicles purchased or leased in the United States that have airbags manufactured by Defendant Takata and have been subject to an airbag-related warning or recall, including, but not limited to, the following vehicles:

2001 – 2007 Honda Accord;

2001 – 2005 Honda Civic;

2002 – 2006 Honda CR-V;

2003 – 2011 Honda Element;

2002 – 2004 Honda Odyssey;

2003 – 2007 Honda Pilot;

2006 Honda Ridgeline;

2003 – 2006 Acura MDX;

2002 – 2003 Acura TL/CL;

2005 Acura RL

3.      The term "Defective Vehicles" includes all vehicles purchased or leased in the United States that have airbags manufactured by Defendant Takata and are recalled at any point after the filing date of this Complaint for a reason relating to airbag defects.

4.      Other vehicles that have been recalled because they have airbags manufactured by Defendant Takata include the following: 2004 Ford Ranger; 2005 – 2006 Ford GT; 2005 – 2007 Ford Mustang; 2002 – 2004 Lexus SC; 2002 – 2005 Toyota Corolla; 2003 – 2005 Toyota Corolla Matrix; 2002 – 2005 Toyota Sequoia; 2003 – 2005 Toyota Tundra; 2003 – 2008 Dodge Ram 1500; 2005 – 2008 Dodge Ram 2500; 2006 – 2008 Dodge Ram 3500; 2006 – 2008 Dodge Ram 4500; 2008 Dodge Ram 5500; 2005 – 2008 Dodge Durango; 2005 – 2008 Dodge Dakota; 2005 – 2008 Chrysler 300; 2007 – 2008 Chrysler Aspen; 2003 – 2005 Pontiac Vibe; 2005 Saab 9-2x; 2003 – 2007 Mazda6; 2006 – 2007 MazdaSpeed6; 2004 – 2008 Mazda RX-8; 2004 – 2005 Mazda MPV; 2004 Mazda B-Series Truck; 2004 – 2005 Mitsubishi Lancer; 2006 – 2007 Mitsubishi Raider; 2001 – 2003 Nissan Maxima; 2001 – 2004 Nissan Pathfinder; 2002 – 2004 Nissan Sentra; 2001 – 2004 Infiniti I30/I35; 2002 – 2003 Infiniti QX4; 2003 – 2005 Infiniti FX35/FX45; 2003 – 2005 Subaru Baja; 2003 – 2005 Subaru Outback; 2003 – 2005 Subaru Legacy; and 2004 – 2005 Subaru Impreza.

5.      Airbags are meant to inflate rapidly during an automobile collision. The airbag's purpose is to cushion occupants during a crash and provide protection to their bodies when they strike objects in the vehicle, such as the steering wheel, dash board, or windshield. When people operate a motor vehicle or ride in one as a passenger, they trust and rely on the manufacturers of those motor vehicles to make those vehicles safe.  And one of the central safety features of any motor vehicle is the airbag.

6.      The Defective Vehicles contain airbags manufactured by Defendant Takata that, instead of protecting vehicle occupants from bodily injury during accidents, violently explode and expel vehicle occupants with lethal amounts of metal debris and shrapnel.

7.      To date, more than 14 million cars with Takata-manufactured airbags have been recalled due to defect(s) described herein ("Defective Airbags" or "Takata airbags"). Plaintiff seeks redress individually and on behalf of those similarly-situated for losses stemming from the Defendants' manufacture and use of defective airbags in the Defective Vehicles.

8.      The manufacturing defect in Takata's airbags dates back to at least April 2000, when, according to one recall notice, some Takata airbags produced between April 2000 and September 2002 contained manufacturing defects. Takata became aware of the defect at least as early as 2001 when the first recall was issued relating to the exploding Takata airbags in Isuzu and Honda vehicles.

9.      In 2004, a Takata airbag in a Honda Accord exploded in Alabama, shooting out metal shrapnel and severely injuring the car's driver. Honda and Takata deemed the incident "an anomaly" and did nothing about it. Honda did not issue a recall. Neither Honda nor Takata sought the involvement of federal safety regulators. In fact, Honda did not tell regulators about this event until an inquiry into its 2009 recall.

10.      The serious danger posed by the lethal Takata airbags was not disclosed to U.S. safety regulators until 2008, despite red flags raised by the 2001 Isuzu and 2004 Honda exploding airbag incidents. Indeed, Honda received three additional reports of airbag rupture incidents in 2007, but never issued recalls or told U.S. safety regulators that the incidents involved exploding airbags.  Finally, in November 2008, Honda informed U.S. authorities that it

had a problem with some of the Takata airbags installed in its vehicles.  However, at that time Honda recalled only 4000 Accords and Civics.

11.     In April 2009, six months after the limited 2008 recall, a Takata airbag in Florida resident Jennifer Griffin's Honda Civic exploded after a minor accident. The lethal explosion sent a two-inch piece of shrapnel from the airbag flying into Ms. Griffin's neck. Although Ms. Griffin survived, when highway troopers found her, blood was gushing from a gash in her neck. Ms. Griffin's car was not part of the 2008 Recall.

12.     In May 2009, a month after Ms. Griffin's accident, 18-year-old Ashley Parham was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped into another car in a parking lot. While she apparently survived the accident itself, the metal shrapnel that shot out of the exploding Takata airbag sliced open her carotid artery and she bled to death.

13.     Ms. Parham's car was not one of those recalled six months earlier by Honda.

14.     It was not until two months after Ms. Parham's death that Honda expanded its 2008 recall to about 400,000 vehicles, summoning back additional 2001 and 2002 Acura, Civic, and Accord models, including the model driven by Ms. Parham.

15.     In recent incidents, first responders have been baffled by the fact that victims of apparently minor accidents suffered injuries more consistent with being shot or stabbed repeatedly.

16.     For example, around July 2014, Florida resident Claribel Nunez was involved in a crash while driving her 2001 Honda Civic. While she survived the automobile accident, she was badly injured when a chunk of metal exploded from her car's Takata airbag into her forehead. She survived, but now suffers from headaches, nausea, and loss of vision.

17.     On September 29, 2014, Florida resident Hien Tran died four days after her 2001 Honda Accord struck another car, and the Takata airbag exploded, sending shrapnel into her neck. The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea. Indeed, her death was initially investigated as a homicide by detectives. A week after she died she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

18.     Despite this shocking record, both Takata and Honda have been slow to report the full extent of the danger to drivers and passengers and failed to issue appropriate recalls. Both Honda and Takata provided contradictory and inconsistent explanations to regulators for the defects in Takata's airbags, leading to more confusion and delay. Indeed, the danger of exploding airbags and the number of vehicles affected was not disclosed for years after it became apparent there was a potentially lethal problem. Instead, Takata and Honda repeatedly failed to fully investigate the problem and issue proper recalls, allowing the problem to proliferate and cause numerous injuries and at least four deaths over the last 13 years.

19.     It was not until 2013, four years after Honda first reported the problem to U.S. regulators, that a more detailed recounting of Takata's safety failures was revealed. The full scope of the defects has yet to be determined. More information about Takata's defective airbags continues to be uncovered today.

20.     Takata's own airbag manufacturing plants did not abide by Takata's internal safety rules. In 2002, Takata's airbag manufacturing plant in Mexico allowed a defect rate that was "six to eight times above" acceptable limits, or roughly 60 to 80 defective parts for every one million airbag inflators shipped.

21.     Equally troubling, Takata misled at least one other car manufacturer to believe that its vehicles were not affected by Takata's defective airbags. In 2010, Takata affirmatively assured BMW that its vehicles were not affected because BMW's airbags were manufactured on a different production schedule from Honda's. It wasn't until 2013 that Takata finally admitted that BMW's airbags were in fact at risk of explosion. Takata's actions thus aided in the delay of other car manufacturers issuing recalls on their vehicles with Takata airbags.

22.     However, the other vehicle manufacturers were on notice as early as 2008 when Honda first notified regulators of a problem with its Takata airbags. Other car manufacturers with Takata airbags in their vehicles knew or should have known at that time that there might be a safety problem with their airbags and should have launched their own investigations and notified customers.

23.     In June 2014, the National Highway Traffic Safety Administration ("NHTSA") announced that BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota were conducting limited regional recalls to address a possible safety defect involving Takata brand airbag inflators. The action was influenced by a NHTSA investigation into six reports of airbag inflator ruptures, all of which occurred in Florida and Puerto Rico.

24.     To date, over 14 million vehicles with Takata's airbags have been recalled worldwide, and there are reports that additional vehicles that have not yet been disclosed by the Defendants could join the list of recalls. The large majority of those recalls have come only within the last year despite the fact that many of the vehicles were manufactured with a potentially defective and dangerous airbag over a decade ago.

1207355.1

25.     U.S. federal prosecutors have taken notice of Takata's failure to properly report the problem with its airbags and are trying to determine whether Takata misled U.S. regulators about the number of defective airbags it sold to automakers.

26.     As a result of Takata's and the Vehicle Manufacturer Defendants' misconduct, Plaintiff and Class Members (defined below) were harmed and suffered actual damages in that the Defective Vehicles have potentially deadly airbags that pose an ongoing threat to drivers and passengers and have drastically diminished the value of the cars in which they are installed. Plaintiff and the Class Members did not receive the benefit of their bargain as purchasers and lessees received vehicles that were of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations. Plaintiff and Class Members did not receive vehicles that would reliably operate with reasonable safety, and that would not place drivers and occupants in danger of encountering an ongoing and undisclosed risk of harm, which could have been avoided. A vehicle purchased or leased under the reasonable assumption that it is "safe" as advertised is worth more than a car-such as the Defective Vehicles-that is known to contain a Takata airbag. All purchasers of the Defective Vehicles overpaid for their vehicles. Furthermore, the public disclosure of the defective Takata airbags has caused the value of the Defective Vehicles to materially diminish. Purchasers or lessees of the Defective Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the defects been disclosed.

27.     Worse still, the current recalls have done little to protect owners and lessees of Defective Vehicles from the urgent and ongoing threat posed by Takata airbags because there are not enough new airbags to replace the millions of recalled airbags.

28.     All owners or lessees of the Defective Vehicles have been strongly urged by the NHTSA "to act immediately" on the recall notices to replace Takata airbags. The NHTSA reiterated that its recall message comes with "urgency" and that "[r]esponding to these recalls, whether old or new, is essential to personal safety."

29.     However, Takata is unable to manufacture enough new, safe airbags quickly enough to replace the faulty airbags in the nearly eight million vehicles that are the subject of the most recent recall. "There's simply not enough parts to repair every recalled single car immediately," said Chris Martin, a spokesman for Honda.[1]

30.     Even if there were enough airbags, dealers are unable to keep up with the volume of customers rushing to get their Takata airbags replaced. Some dealers have reported receiving up to 900 calls per day about the recalls and are telling customers that they may have to wait months before airbags can be replaced.

31.     Instead of replacing the airbags, some dealers are either disabling airbags and leaving customers with vehicles that are unsafe to drive, or are advising customers to not drive vehicles with Takata airbags until the airbags can be replaced.

32.     Toyota has taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until proper repairs can be made. In the alternative, Toyota is advising customers to not drive their vehicles with Takata airbags until the airbags can be replaced. Toyota has not explained how drivers who rely on these vehicles for work and school are to cope without means for transportation.

33.     Plaintiff and Class Members are either left with unsafe vehicles or no vehicle at all. At this time, Defendants are not offering customers the use of loaner vehicles.

---

[1] Hiroko Tabuchi and Christopher Jensen, *It Looked Like a Stabbing, but Takata Airbag Was the Killer*, N.Y. Times, Oct. 20, 2014.

34.     Congress is also concerned with this serious problem and has questioned the legality of Toyota's and other automakers' responses. U.S. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation (DOT), expressed their alarm "that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. **As a matter of policy, this step is extraordinarily troubling and potentially dangerous**. As a matter of law . . . § 30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags."[2]

35.     Equally important, the Senators said, is that "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."[3] "**[Y]our office should strongly encourage manufacturers to provide rental cars at no cost to consumers if their cars cannot be fixed immediately because of insufficient replacement parts.**"[4]

36.     As these Senators have recognized, there is an immediate need to provide safe vehicles for Plaintiff and Class Members. Otherwise, many may be left without a vehicle to take them to and from work, to be able to pick up their children from school or childcare, or, in the most urgent situations, a vehicle to transport themselves or someone else to a hospital.

---

[2] *Blumenthal, Markey Call On NHTSA To Issue Nationwide Safety Recall For All Cars With Potentially-Defective Takata Airbags*, http://www.markey.senate.gov/news/press-releases/blumenthal-markey-call-on-nhtsa-to-issue-nationwide-safety-recall-for-all-cars-with-potentially-defective-takata-airbags (October 23, 2014) (emphasis added).

[3] *Id.* (emphasis added).

[4] *Id.* (emphasis added).

37.     Takata and the Vehicle Manufacturer Defendants knew or should have known that the Takata airbags installed in millions of vehicles were defective. Both Takata and the Vehicle Manufacturer Defendants have shown a blatant disregard for public welfare and safety by concealing their knowledge of the nature and extent of the defects from the public.

**JURISDICTION AND VENUE**

38.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

39.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because they conduct substantial business in this District, some of the actions giving rise to the Complaint took place in this District, and some of Plaintiff's claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

40.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendants have caused harm to Class Members residing in this District, and the Defendants are residents of this District under 28 U.S.C. 1391(c)(2) because they are subject to personal jurisdiction in this district.

## THE PARTIES

41.     Plaintiff Monte Leger is a resident and citizen of Houston, Texas.  Plaintiff Monte Leger acquired a 2002 Honda Accord, VIN 1HGCG32592A030714, which, unknown at the time of acquisition, contained Defective Airbags that could injure and/or kill.

42.     Defendant Takata Corporation ("Takata") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Takata is a specialized supplier of automotive safety systems that designs, manufactures, tests, markets, distributes, and sells airbags. Takata is a vertically-integrated company and manufactures component parts in its own facilities.

43.     Defendant TK Holdings Inc. ("TK Holdings") is a subsidiary of Takata Corporation headquartered in Auburn Hills, Michigan.  TK Holdings sells, designs, manufactures, tests, marks, and distributes airbags in the United States. TK Holdings both directly and through subsidiaries, owns and operates 56 manufacturing plants in twenty countries. TK Holdings manufactures airbags in the United States, including airbags at issue in this litigation.

44.     Highland Industries, Inc. ("Highland") is a subsidiary of Takata Corporation and is headquartered in Greensboro, North Carolina. Highland manufactures industrial and automotive textile product solutions including airbag fabrics for the automotive airbag industry. Highland manufactures airbags in the United States, including airbags at issue in this litigation.

45.     Defendants Takata, TK Holdings, and Highland are collectively referred to as "Takata" or "Takata Defendants." Takata is the manufacturer of all the faulty airbags recalled by the NHTSA that are the subject of this Complaint.

46.     Defendant Honda Motor Co., Ltd. ("Honda Motor") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Honda Motor manufactures and sells motorcycles, automobiles, and power products through independent retail dealers, outlets, and authorized dealerships primarily in Japan, North America, Europe, and Asia.

47.     Defendant American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor headquartered in Torrance, California. American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, and sport utility vehicles automobile parts in the United States. American Honda manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana, East Liberty, Ohio, Lincoln, Alabama, and Marysville, Ohio.

48.     Defendants Honda Motor and American Honda are collectively referred to as "Honda," the "Honda Defendants," or the "Vehicle Manufacturer Defendants." Honda vehicles sold in the United States contain airbags manufactured by the Takata Defendants. The NHTSA has recalled to date the following Honda vehicles for having faulty Takata airbags, totaling 5,051,364 vehicles: 2001-2007 Honda Accord; 2001-2005 Honda Civic; 2002-2006 Honda CR-V; 2003-2011 Honda Element; 2002-2004 Honda Odyssey; 2003-2007 Honda Pilot; 2006 Honda Ridgeline; 2003-2006 Acura MDX; 2002- 2003 Acura TL/CL; and 2005 Acura RL.

49.     The Honda Defendants and Takata Defendants are collectively referred to herein as "Defendants."

## FACTUAL ALLEGATIONS

### Takata is a Major Manufacturer of Airbags and Inflators

50.     Defendant Takata is the world's second largest manufacturer of automotive safety devices, including airbags. Takata was a pioneer in developing driver side airbags, being

the first to market driver side airbags in the early 1980s. Takata has supplied airbags to U.S. consumers and to state and local governmental purchasers since at least 1983.

51.    Airbags made up 37.3% of Takata's automotive safety products business in 2007.

52.    Takata also develops other safety technologies, including cushions and inflators, which are components of Takata-manufactured airbags.

53.    The airbags at issue in this case were developed by Takata in the late 1990s in an effort to make airbags more compact and to reduce the toxic fumes that earlier airbag models emitted when deployed. The redesigned airbags are inflated by means of an explosive based on a common compound used in fertilizer. That explosive is encased in a metal canister.

54.    The two Takata plants that manufactured the airbags at issue in this Complaint are located in Moses Lake, Washington and Monclova, Mexico. These plants also manufacture airbag inflators.

55.    Airbags manufactured by Takata, including the airbags at issue in this case, have been installed in vehicles manufactured by at least ten different automakers, including Honda.

56.    Takata Corporation has, since at least 2007, claimed to prioritize driver safety as its "dream."[5]

57.    Based on that "dream," they claimed to be "motivated by the preciousness of life" and pledged to both "communicate openly and effectively."[6] Takata has failed to live up to its dream by manufacturing, distributing, and selling airbags that can cause serious bodily injury or death.

---

[5] Takata Company Investor's Meeting Presentation- Investment Highlights, FY2007, at 3.
[6] *Id*.

**Honda Field Reports and Takata Internal Testing Reveal a Problem**

58.     Takata has known since at least 2001 that Takata airbags, and particularly the inflator component, were defective, as Isuzu was forced to make a recall that year due to exploding Takata airbags.

59.     In 2004, a Takata airbag violently exploded in a Honda Accord, shooting out metal fragments and injuring the car's driver. At a loss to explain the incident, Honda and Takata deemed it "an anomaly" and did not issue a recall or seek the involvement of federal safety regulators.[7]

60.     In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents. All three involved defective airbags driving metal fragments into the faces and limbs of car passengers upon deployment of the airbags. These incidents triggered an internal investigation by Takata, including a survey of inflators.

61.     Honda settled financial claims with the individuals injured by the airbags. These settlements were confidential.

62.     Honda filed a standard report with U.S. safety regulators on the initial air bag injury in 2004, and followed up with similar filings on the incidents in 2007. Inexplicably, Honda did not issue any recalls and never informed safety regulators of the most critical detail of these incidents: that the airbags posed a substantial risk of serious injury or death when deployed.

**The 2008 Recall: Recall 08V593**

63.     Takata shared the results of the inflator survey analysis with Honda in November of 2008. That analysis indicated an airbag inflator issue. The results triggered a

---

[7] Hiroko Tabuchi, *Air Bag Flaw, Long Known to Honda and Takata, Led to Recalls*, N.Y. Times, Sept. 11, 2014.

Honda recall, but for only about 4200 of its vehicles. This recall occurred over four years after the first airbag explosion incident in a Honda car.

64.     The November 2008 recall involved certain 2001 Honda Accord and Civic vehicles to replace airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). [8] Honda reported that it learned of the problem via a June 2007 claim.

### The 2009 Recall: Recall 09V259

65.     In June of 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

66.     Honda subsequently received two more claims of "unusual deployments," Ms. Parham's May 28, 2009 accident and another in June 9, 2009.

67.     As a result of Takata's June 2009 follow up report and the additional claims of "unusual deployments," on June 30, 2009, Honda expanded the recall to 440,000 vehicles, which included 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall").

68.     In August 2009, the NHTSA Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."[9]

69.     NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this

---

[8] Honda Recall Letter to NHTSA (Nov. 11, 2008), at 2.
[9] Letter from NHTSA to American Honda Motor Co. (Aug. 19, 2009)

distinction, or any other between the two sets of vehicles, convinced HMC at the time that it did not need to include the latter set in the 08V-593 recall population."[10]

70.     The NHTSA Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.[11]

71.     In Honda's September 2009 reply to the NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[W]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."[12]

72.     Honda also reported, based on information from Takata, the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators." Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "one production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.[13]

73.     Honda also disclosed to the NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also, for the first time, told NHTSA about the 2004 incident involving an "unusual deployment" of the vehicles airbag. Honda claimed that it "only recently were reminded of this incident," and that, until recently, Honda "had not associated it with the [2008 Recall] campaign."[14]

---

[10] *Id.*

[11] *Id.*

[12] Letter from Honda American Motor Co. to NHTSA, at 1 (Sept. 16, 2009).

[13] *Id.* at 1.

[14] *Id.* at 24.

74. At least four complaints have been submitted to the NHTSA by Honda vehicle operators reporting defective airbag deployments that have released metal shards into the cabin of the Honda vehicle.

**Takata's Contact with NHTSA**

75. In its communications with the NHTSA, Takata continually gave misleading or incorrect information about the airbags it manufactured that were part of the recalls.

76. On November 20, 2009, the NHTSA requested information from Takata as part of their ongoing investigation into the airbag inflators that triggered the 2009 Recall.

77. Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response"). Both responses provided vague and misleading information about the seriousness of the problem.

78. In both responses, Takata asserted that there were no substantive design differences between the inflators in the airbags at issue in the two recalls. However, in the Full Response, Takata states that there were, in fact, differences in the production processes between the lots.

79. In both responses, Takata asserted that the defects only existed in specific lots manufactured between certain dates. They claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000. They also claimed that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001.

80. Takata did not provide the dates the inflators were shipped, as the NHTSA requested, because, as Takata admitted, its records did not have that information. Instead, they gave just the manufacturing dates.

81.     In both the Partial Response to NHTSA on December 23, 2009, and the Full Response on February 19, 2010, Takata stated that: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] **to any customers other than Honda. The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda.**"[15] This statement would prove to be untrue.

82.     In its Full Response, Takata asserted that the defect identified in the 2009 Recall was the result of a single compression press, although Takata recommended to Honda that a small number of other vehicles with propellant processed on a different press be recalled as well.

83.     In the Full Response, Takata asserted that the defective parts were all manufactured on a particular press (the "Stokes press") in a single manufacturing plant. Takata further asserted that while they did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."[16]

84.     Takata wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic combustion. This recommendation, as well as the analysis that supported it, was presented to Honda on June 12, 2009."[17]

---

[15] Letter from Takata to NHTSA (Dec. 23, 2009), at 2; Letter from Takata to NHTSA (Feb. 19, 2010), at 2 (emphasis added).

[16] Letter from Takata to NHTSA (Feb. 19, 2010), at 5.

[17] *Id*. at 11-12.

85.     Both Honda and Takata represented to the public and the NHTSA that the total number of affected vehicles was quite small.

### The 2010 Recall: Recall 10V041

86.     In 2010, merely months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles, including 2002 Honda CR-V, 2002 Honda Odyssey, 2003 Honda Pilot, 2002-2003 Acura 3.2TL, and 2003 Acura 3.2CL vehicles, while adding more 2001 and 2002 Accords and Civics to its 2009 recall list ("2010 Recall").

87.     Honda's explanation for the airbag defects changed yet again. Honda explained that there are two different manufacturing processes utilized in the preparation of an airbag propellant. While one process is within specification, the other is not. Honda's expanded recall reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

### The 2011 Recall: Recall 11V260

88.     In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall").

### The 2013 Recall: Recall 13V132

89.     By 2013, it became clear that the defective airbag issue was far more widespread than Takata or Honda initially reported to the NHTSA.

90.     According to Honda's 2013 Defect and Noncompliance report, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from the NHTSA to collect "healthy" airbag modules to see if "abnormal combustion was possible." Honda found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

- 19 -

91.     On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation" into Honda's defective Takata airbags.  Honda stated:

> A recreation of propellant production using the same methods as were used during 2001-2002 production periods indicated that it was possible for propellant produced during 2001-2002 to be manufactured out of specification without the manufacturing processes correctly identifying and removing the out of specification propellant. Separately, Honda was informed by the supplier of another potential concern related to airbag inflator production that could affect the performance of these airbag modules.[18]

92.     On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for their 2001-2003 Civic, 2002-2003 CR-V, and their 2002 Odyssey vehicles with the NHTSA. In that notification, Honda asserted that 561,422 vehicles could be affected by the following part defect:

**Defect description**:

> In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.[19]

93.     On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment" ("Takata DIR"). In that report, Takata identified the defective airbags as follows:

> Certain air bag inflators installed in frontal passenger-side air bag modules equipped with propellant wafers manufactured at Takata's Moses Lake, Washington plant during the period from April 13 2000 (start of production) through September 11, 2002 . . . and certain air bag inflators manufactured at Takata's Monclova, Mexico plant during the period from October 4, 2001 (start of production) through October 31, 2002. . . .[20]

---

[18] Letter to NHTSA from Honda (April 10, 2013), at 3.

[19] *Id.* at 2.

[20] Takata DIR (April 11, 2013) at 3.

94.     It wasn't until its April 2013 Report that Takata finally admitted that its affected inflators were installed as original equipment in vehicles manufactured by car manufacturers other than Honda, including Toyota, Nissan, Mazda, and BMW.[21]

95.     Takata asserted that it did not know how many inflators were installed in vehicles, as it did not have those records.[22] While it did not have the information to estimate the number of vehicles affected, Takata still insisted that the total number of installed inflators would be extremely low.

96.     Takata described the defect as follows:

Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.[23]

**Recalls and Notices Relating to Defective Airbag Inflators in Non-Honda Vehicles**

97.     In April of 2013, based on Takata's new admissions, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of **3.6 million** vehicles containing Takata airbags.

98.     Chrysler and Ford similarly announced limited regional NHTSA recalls for vehicles originally sold or currently registered in Florida, Puerto Rico, Hawaii, or the U.S. Virgin Islands, and equipped with Takata airbag inflators.

---

[21] *Id.* at 2-3.

[22] *Id.* at 3.

[23] *Id.* at 3-4.

99.     On October 22, 2014, the NHTSA expanded the list of vehicles affected by the recall of defective Takata components to cover ten automakers and numerous car models, totaling nearly 8 million vehicles. Those automakers are BMW (627,615 potentially affected vehicles), Chrysler (371,309 potentially affected vehicles), Ford (58,669 potentially affected vehicles), General Motors (undetermined number of potentially affected vehicles), Honda (5,051,364 potentially affected vehicles), Mazda (64,872 potentially affected vehicles), Mitsubishi (11,985 potentially affected vehicles), Nissan (694,626 potentially affected vehicles), Subaru (17,516 potentially affected vehicles) and Toyota (877,000 potentially affected vehicles).[24]

100.    Over the past 13 years that Takata has known there was a problem with the safety of their airbags, there have been at least four deaths and 139 injuries linked to defective Takata airbags.

### Takata Fails to Meet Safety Standards and Maintain Airbag Quality

101.    As recently as 2011, supervisors at Takata's Monclova plant were reporting potentially lethal defects in the manufacturing process. Based on internal Takata documents, Takata was unable to meet its own standards for safety up until at least 2011.[25]

102.    Despite all the theories proposed by Takata to federal regulators as to the sources of the defects, according to documents reviewed by *Reuters*, Takata also cited rust, bad welds, and even chewing gum dropped into at least one inflator as reasons for the defects. The same documents show that in 2002, Takata's plant in Mexico allowed a defect rate that was "six

---

[24] National Highway Traffic Safety Administration, *Consumer Advisory: Vehicle Owners with Defective Airbags Urged to Take Immediate Action* (Oct. 22, 2014), *available at* http://www.nhtsa.gov/About+NHTSA/Press+Releases/Vehicle-owners-with-defective-airbags-urged-to-take-immediate-action

[25] Joanna Zuckerman Bernstein, Ben Klayman, and Yuko Kubota, *Exclusive: Takata engineers struggled to maintain airbag quality, documents reveal*, Reuters, Oct. 17, 2014, *available at* http://www.reuters.com/article/2014/10/18/us-takata-airbags-idUSKCN0I701B20141018.

to eight times above" acceptable limits, or roughly 60 to 80 defective parts for every 1 million airbag inflators shipped.

### Federal Investigations

103.     The NHTSA is now investigating Takata airbags manufactured between 2000 and 2007 to determine whether Takata airbag inflators made during that time were improperly sealed.[26]

104.     In a Consumer Advisory dated October 22, 2014, the NHTSA said:

> The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

105.     The U.S. Department of Justice has reported that it is investigating whether Takata misled U.S. regulators about the number of defective airbags it sold to automakers, including Toyota and Honda.

### Automakers Have Failed to Provide Vehicle Owners with Takata Airbags with Replacement Parts or Vehicles

106.     In a statement from Honda regarding Airbag Inflator Regional Safety Improvement Campaigns, dated October 22, 2014, Honda announced:

> If a customer has received notification from Honda about this special campaign, Honda requests that the customer promptly contact his/her local authorized dealer and make an appointment for replacement of the covered airbag components.

---

[26] Ben Klayman, *U.S. regulators expand number of vehicles affected by Takata recalls*, Oct. 22, 2014, Reuters, *available at* http://www.reuters.com/article/2014/10/22/us-autos-takata-warning-idUSKCN0IB03B20141022.

107.     However, Honda has acknowledged that it would not send out recall letters to car owners or lessees until there are parts available, meaning that many drivers would not receive notices for weeks or longer as they continue to drive vehicles with potentially deadly airbags.

108.     Like Honda, other automakers have also instructed customers to make an appointment to replace their Takata airbags at an authorized dealer.

109.     But, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags. Dealers have been telling frustrated car owners to expect to wait many months before their airbags can be replaced. Honda owners who have received recall notices have been told to wait at least a month before their authorized dealer has availability to assess their vehicle. Toyota dealers are reporting that wait times for customers who own affected vehicles to get their Takata airbags replaced could be as long as one to three months.[27]

110.     In response to the airbag replacement shortage, Toyota has taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made. In the alternative, Toyota is advising customers to not drive their vehicles with Takata airbags until the airbags can be replaced.

111.     Like Toyota, other automakers have also resolved to remedy their customers' vehicles containing Takata airbags not by providing temporary replacement vehicles or replacement parts, but by disengaging the airbags entirely.

112.     In fact, customers are put in potentially dire situations because replacement airbag parts are not available in the quantities demanded by those affected by the millions of

---

[27] Jeff Harrington, *Tampa Bay auto dealers warn of delays to replace defective airbags*, Tampa Bay Times, October 21, 2014, *available at* http://www.tampabay.com/news/business/autos/tampa-bay-auto-dealers-warn-of-delays-to-replace-defective-airbags/2203132.

recalls. At this time, automakers are not offering customers loaner cars to use until their airbags can be replaced.

113.    Congress is also concerned with this serious problem. U.S. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation (DOT), "urge[d] [the DOT] to provide clear guidance regarding [NHTSA's] October 21st Consumer Advisory about potentially defective Takata airbags."[28]

114.    The Senators expressed their belief "that NHTSA should immediately issue a nation-wide safety recall on all the affected cars, regardless of where the car is registered. NHTSA's October 21, 2014 Consumer Advisory provided "no factual basis for distinguishing between states or regions of the country regarding the potential severe danger of this defect to motorists. All states experience seasons of heat and humidity . . . Replacement parts are, 'essential to personal safety,' **for all drivers** whether they live in New England or Florida, and the NHTSA should immediately issue a nation-wide recall that protects all drivers."[29]

115.    The Senators were also "alarmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (40 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT]

---

[28] Letter from U.S. Senators Richard Blumenthal and Edward J. Markey to the U.S. Dept. of Transportation (Oct. 23, 2014), at 1.
[29] *Id.* at 2 (emphasis added).

issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags."[30]

116.     Equally important, the Senators said, is that "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."[31] "**[Y]our office should strongly encourage manufacturers to provide rental cars at no cost to consumers if their cars cannot be fixed immediately because of insufficient replacement parts**."[32]

117.     The governmental investigation on the defective Takata airbags is ongoing. On November 13, 2014, the United States Attorney's Office for the Southern District of New York served Takata with a subpoena from a federal grand jury, seeking documents related to the company's knowledge of risks posed by the Defective Airbags.

118.     Plaintiff and Class Members are now left in the position of either being without a vehicle or driving a vehicle that does not have an operable airbag for months at a time. They are left without a vehicle to take them to work, to pick up their children at school or childcare, or, more urgently, a vehicle for emergency situations. Plaintiff and Class Members must also take time away from work and other important obligations to take their vehicles to the repair shop when replacement parts do become available.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

119.     Upon information and belief, Defendant Takata has known of the defects in its airbags since at least 2001. Defendant Honda has known of the defects in the Takata airbags in

---

[30] *Id.* at 1.

[31] *Id.* at 2.

[32] *Id.* (emphasis added).

Honda's vehicles since at least 2004. Defendants knew well before Plaintiff and Class Members purchased the Defective Vehicles, and have concealed from or failed to notify Plaintiff, Class Members, and the public of the full and complete nature of the defects.

120.    Although Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

121.    Any applicable statute of limitation has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

## Estoppel

122.    Defendants were and are under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the vehicles.  They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles.  Plaintiff and Class Members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

## Discovery Rule

123.    The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their vehicles contain the Defective Airbags.  Even then, Plaintiff and Class Members had no reason to know of the true nature of the defect in the airbags because of Defendants' active concealment of the defect.

## CLASS ACTION ALLEGATIONS

124.    Plaintiff brings this lawsuit as a class action individually and on behalf of all other persons similarly situated as members of the proposed Class, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or c(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

125.    The Class claims all derive directly from a single course of conduct by Takata and the Honda Defendants. This case is about the responsibility of Takata and the Honda Defendants, at law and in equity, for their knowledge, their conduct, and their products. Takata and the Honda Defendants have engaged in uniform and standardized conduct toward the Classes. They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members.

126.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 of the Federal Rules of Civil Procedure provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiff or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## The Nationwide Class

127.     Plaintiff brings this action and seeks to certify and maintain it as a class action under Rules 23(a); (b)(1) and/or (b)(2); and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a Nationwide Class (the "Nationwide Class") defined as follows:

> All persons or entities in the United States who purchased or leased one or more Defective Vehicles in the United States.

## The Texas State Class

128.     Plaintiff seeks to represent the following statewide class (the "Texas Class") defined as follows:

> All persons in the State of Texas who entered into a lease or purchased one or more of the Defective Vehicles.

129.     The Nationwide Class, the Texas Class, and their members are sometimes referred to herein as the "Class," "Classes," or "Class Members."

130.     To the extent warranted, the list of Defective Vehicles for the purpose of the Nationwide Class and the Texas Class definitions will be supplemented to include other vehicles that have Takata airbags that may be defective.

131.     Excluded from the Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Takata and the Honda Defendants; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein.  Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into additional subclasses, or modified in any other way.

## **Numerosity and Ascertainability**

132.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Plaintiff is informed and believes that there are millions of Defective Vehicles nationwide, and thousands of Defective Vehicles in each of the States. Individual joinder of all Class members is impracticable.

133.     Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.  The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

134.     Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Takata, the Honda Defendants, and/or third parties in the usual course of business, and within their control.

## **Typicality**

135.     Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by Takata and the Honda Defendants. Plaintiff, like all Class Members, has been damaged by Defendants' misconduct in that they have incurred losses relating to the Defective Airbags.  Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members. The relief Plaintiff seeks is typical of the relief sought for the absent Class members.

**Adequate Representation**

136.     Plaintiff will fairly and adequately represent and protect the interests of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

137.     Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiff nor his counsel has interests adverse to those of the Classes.

**Predominance of Common Issues**

138.     There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members.   These common legal and factual issues include the following:

      a.     Whether the Defective Vehicles suffer from airbag defects;

      b.     Whether the Defective Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

      c.     Whether Defendants knew or should have known about the airbag defects, and, if so, how long Defendants have known of the defects;

      d.     Whether the defective nature of the Defective Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Defective Vehicle;

      e.     Whether Defendants had a duty to disclose the defective nature of the Defective Vehicles to Plaintiff and Class Members;

- 31 -

f.      Whether Defendants omitted and failed to disclose material facts about the Defective Vehicles;

g.      Whether Defendants' concealment of the true defective nature of the Defective Vehicles induced Plaintiff and Class Members to act to their detriment by purchasing the Defective Vehicles;

h.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

i.      Whether Defendants misrepresented that the Defective Vehicles were safe;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective airbag inflators;

k.      Whether Defendants' conduct, as alleged herein, likely to mislead a reasonable consumer;

l.      Whether Defendants' statements, concealments and omissions regarding the Defective Vehicles material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

m.      Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

n.      Whether the Defective Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o.      Whether Plaintiff and the Classes are entitled to a declaratory judgment stating that the airbag inflators in the Defective Vehicles are defective and/or not merchantable;

p.      Whether Defendants' unlawful, unfair, and/or deceptive practices harm Plaintiff and the Classes;

q.      Whether Defendants have been unjustly enriched by their conduct;

r.      Whether Plaintiff and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

s.      Whether Defendants should be declared responsible for notifying all Class members of the defects and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

t.      What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy; and

u.      How such penalties should be most equitably distributed among Class members.

## **Superiority**

139.    Plaintiff and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

140.    The prosecution of separate actions by the individual Class Members on the claims asserted herein would create a risk of inconsistent or varying adjudications for individual Class members, which would establish incompatible standards of conduct for Takata and the Honda Defendants; and because adjudication with respect to individual Class Members would,

- 33 -

as a practical matter, be dispositive of the interests of other Class Members, or impair substantially or impede their ability to protect their interests.

141.     Absent a class action, most Class Members would likely find the cost of litigating their individual claims prohibitively high and would therefore have no effective remedy at law. Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).  Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

142.     Classwide declaratory, equitable, and injunctive relief is appropriate under Rule 23(b)(1) and/or (b)(2) because Defendants have acted on grounds that apply generally to the Class, and inconsistent adjudications with respect to the Defendants' liability would establish incompatible standards and substantially impair or impede the ability of Class Members to protect their interests.  Classwide relief assures fair, consistent, and equitable treatment and protection of all Class Members, and uniformity and consistency in Defendants' discharge of their duties to perform corrective action regarding the Defective Airbags

143.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Takata's and Honda's conduct and responsibility predominate over any questions affecting only individual Class members.

144.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

145.     The Classes expressly disclaim any recovery in this action for physical injury resulting from the airbag inflator defects without waiving or dismissing such claims. Plaintiff is informed and believes that injuries suffered in crashes as a result of the defective airbags implicate the Defective Vehicles and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls. The increased risk of injury from the airbag defects serves as an independent justification for the relief sought by Plaintiff and the Classes.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. §§ 2301 *et. seq.***
**(Brought on behalf of the Nationwide Class against all Defendants)**

146.     Plaintiff brings this Claim for Relief on behalf of members of the Nationwide Class.

147.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

1207355.1

148.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

149.     The Defective Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

150.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

151.     Defendants are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

152.     The Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)(1) provides a claim for relief for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

153.     Defendants provided Plaintiff and the other Class Members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Defective Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

154.     Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Defective Vehicles share common design defects in that they are

- 36 -

equipped with Defective Airbags that can explode, leaving occupants of the Defective Vehicles vulnerable to serious injury and death. Defendants have admitted that the Defective Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address each of the defects.

155.     In their capacity as warrantors, as Defendants had knowledge of the inherent defects in the Defective Vehicles, any efforts to limit the implied warranties in a manner that would exclude coverage of the Defective Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Defective Vehicles is null and void.

156.     The limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants and Plaintiff and the other Class Members, as, at the time of purchase and lease, Plaintiff and the other Class Members had no other options for purchasing warranty coverage other than directly from Defendants.

157.     The limitations on the warranties are substantively unconscionable. Defendants knew that the Defective Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendants failed to disclose these defects to Plaintiff and the other Class Members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

158.     Plaintiff and each of the other Class Members have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract. Nonetheless, privity is not required here because Plaintiff and each of the other Class Members are intended third-party beneficiaries of contracts between Defendants and its dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided

- 37 -

with the Defective Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Defective Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

159.     Pursuant to 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

160.     Furthermore, affording Defendants an opportunity to cure their breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Defective Vehicle, Defendants knew, should have known, or were reckless in not knowing of their misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

161.     Plaintiff and the other Class Members would suffer economic hardship if they returned their Defective Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class Members have not re-accepted their Defective Vehicles by retaining them.

162.     Pursuant to 15 U.S.C. § 2310(d)(3), the amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action

- 38 -

exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

163.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and the other Class Members in connection with the commencement and prosecution of this action.

164.    Further, Plaintiff and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1). Based on Defendants' continuing failures to fix the known dangerous defects, Plaintiff seeks a declaration that Defendants have not adequately implemented their recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted. Plaintiff also seeks the establishment of a Defendant-funded program for Plaintiff and Class Members to recover out of pocket costs incurred.

165.    Plaintiff also requests, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the airbags in their vehicles. Such expenses and losses will continue as Plaintiff and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

166.    The right of Class Members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common

questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by the Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## SECOND CLAIM FOR RELIEF
### Fraud by Concealment
### (Brought on behalf of the Nationwide Class against all Defendants)

167.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

168.    Plaintiff brings this Claim for Relief on behalf of the Nationwide Class.

169.    As set forth above, Defendants concealed and/or suppressed material facts concerning the safety of their vehicles.  Defendants knew that the Defective Vehicles were designed and manufactured with airbag defects, but Defendants concealed those material facts. Defendants recklessly manufactured and distributed the Defective Vehicles to consumers in the United States, even though Defendants knew, or should have known, at the time of distribution, that the Defective Vehicles contained material airbag defects.  Plaintiff and Class Members had no knowledge of these defects at the time that they purchased or leased the Defective Vehicles.

170.    Defendants made material omissions and/or affirmative misrepresentations regarding the safety of their vehicles.

171.    Defendants each knew these representations were false when they were made.

172.    The Defective Vehicles purchased or leased by Plaintiff and Class Members were, in fact, defective, unsafe, and unreliable, because the vehicles contained dangerous airbag defects.

173.    Defendants had a duty to disclose these safety issues to Plaintiff, Class Members, the public, and NHTSA, but failed to do so.

174.     Defendants had a duty to disclose the true facts about the safety of the Defective Vehicles because Defendants had superior knowledge and access to those facts, and the facts were not known to or reasonably discoverable by Plaintiff and Class Members. Defendants knew that Plaintiff and Class Members had no knowledge of dangerous airbag defects in the Defective Vehicles, and that neither Plaintiff nor the other Class Members had an equal opportunity to discover the facts to inform them of those defects.  Indeed, Plaintiff and Class Members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

175.     Defendants had a duty to disclose that the Defective Vehicles were defective, unsafe, and unreliable in that it contained dangerous airbag defects, because Plaintiff and Class Members relied on Defendants' representations that the vehicles they were purchasing, leasing, and/or retaining were safe and free from defects.

176.     The aforementioned concealment was material, because if it had been disclosed, Plaintiff and Class Members would not have bought, leased or retained their vehicles.

177.     The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle.  Defendants each knew or recklessly disregarded that their representations and/or statements on the safety of the Defective Vehicles were false.

178.     As a result of the concealment and/or suppression of facts, Plaintiff and Class Members have sustained and will continue to sustain damages arising from the difference between the actual value of that which Plaintiff and the Classes paid and the actual value of that which they received.

1207355.1

179.     Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**THIRD CLAIM FOR RELIEF**
**Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO)**
**18 U.S.C. §§ 1961-1968**
**(Brought on behalf of the Nationwide Class against all Defendants)**

180.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

181.     Plaintiff brings this Claim for Relief on behalf of the Nationwide Class.

182.     The Honda Defendants and Takata Defendants are all "persons" under 18 U.S.C. § 1961(3).

183.     Honda and Takata comprised and comprise an association-in-fact enterprise engaged in and whose activities affect interstate commerce.

184.     Honda and Takata were and are associated in fact for the purported purpose of determining the root cause of the inflator defect and the solution thereto, but the enterprise's apparent actual purpose is to conceal and/or minimize the scope of the defective airbag problems and the risks to vehicle occupant safety that they pose.

185.     The enterprise commenced in February 2001, if not sooner, when the first Honda vehicle was recalled for the Takata exploding-airbag defect (Recall No. 01V-055). Takata was aware of significant problems at its plant in Monclova, Mexico, as shown by, among other things, internal Takata reports prepared from 2001 to 2003, titled "potential failures," identifying at least 45 inflator manufacturing problems, by Takata engineers' identification in

- 42 -

2001 of inflators subject to failure because of faulty welding and rust, and by former Takata quality-control managers' assertions that in the early 2000s airbags were not inspected for damage after being dropped by forklifts. Therefore, Takata knew or should have known that its identification of precisely three vehicles (two Isuzu Rodeos and one Honda Passport) with faulty inflators was inaccurate and would lead to an under-inclusive recall.

186.     Over the course of a decade Honda and Takata shared information about injurious airbag deployments, jointly (and secretly) investigated the possible causes of those deployments, delayed and/or prevented the release of inculpatory information, misled regulatory authorities, and maintained a consistent public posture as to the scope of vehicles affected by the defective airbags and the safety risks those airbags posed.

187.     More specifically, the following conduct demonstrates continuous and ongoing collaboration, communication, and coordination between Honda and Takata:

a.     After an airbag in a 2002 Honda Accord exploded in Alabama in 2004, Honda and Takata investigated the incident. Honda stated that, after the accident, it "immediately shared all available information with the airbag supplier [Takata]."[33] Honda determined that Takata had provided a reasonable explanation of the defect as an "anomaly" because Takata claimed it could not find a cause for the explosion, and neither studied the matter any further. Yet by this time Honda was obviously aware of the exploding-airbag Honda Passport recall in February 2001, and Takata was aware of faulty welding and rust in the inflators produced at its plant in Monclova, Mexico, which Takata engineers believed could cause the inflators to fail. Also, between 2001 and 2003 various internal Takata reports titled "potential failures" show that Takata struggled with

---

[33] Hiroko Tabuchi, *Takata Offers Its Rebuttal to Report of Secret Airbag Tests*, THE NEW YORK TIMES, Nov. 12, 2014, *available at* http://nyti.ms/1sGCwuF.

at least 45 different inflator manufacturing problems.  Moreover, in 2002 Takata's Monclova plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's quality control limit.  In light of this accumulated knowledge, Honda's and Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

b.      Also in 2004, as reported by *The New York Times*, Takata concealed and destroyed negative results from secret airbag tests it conducted in response to the explosion in Alabama.  Over weekends and holidays during the summer of 2004 at Takata's American headquarters in Auburn Hills, Michigan, Takata conducted secret tests on 50 airbags it had retrieved from scrapyards.  The tests were conducted by Al Bernat, Takata's then-vice president of engineering.  In two of the airbags, the steel inflators cracked.  Takata engineers theorized that welding problems made the inflator vulnerable to splitting and rupturing, and they began designing possible fixes, according to employees involved in the testing.  But Takata executives discounted the test results and ordered the lab technicians to delete the test data from company computers and to dispose of the airbag inflators in the trash.  Also trashed were prototypes of design alternatives. According to a former Takata employee, "[a]ll the testing was hush-hush. . . . Then one day, it was, 'Pack it all up, shut the whole thing down.'  It was not standard procedure."[34]  In regulatory filings, Takata has since stated that it began testing the problematic airbags in 2008—four years after these secret tests.  Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and Honda and

---

[34] Hiroko Tabuchi, *Takata Saw and Hid Risk in Airbags in 2004, Former Workers Say*, THE NEW YORK TIMES, Nov. 6, 2014, *available at* http://nyti.ms/1psPNw1.

Takata were by 2004 communicating about the defective inflators, Plaintiff alleges, upon information and belief, that Honda was aware of Takata's secret testing.

c.      Between February 2007 and June 2007, Honda reported three airbag ruptures, all causing injuries, to Takata.  Honda decided not to order a recall but rather to await the results of a "failure mode analysis" to be performed by Takata.  Honda and Takata again chose to keep vitally important, safety-related information between only the two of them.  In light of what the two companies knew about the defective airbags, this "failure mode analysis" was nothing more than an attempt to divert the attention of regulators and the public.  Honda and Takata had no need for further analysis; they already knew the airbags were defective.

d.      In September 2007, Honda began collecting inflators returned to dealers, for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators.  Honda also collected inflators from scrap yards for the same purpose.  Takata began what turned out to be a year-long study of the defect.

e.      In September 2008, Takata completed the year-long study and determined that moisture was at the root of the defect.  In light of the known, serious safety risks of which Takata and Honda were aware, that the study took an entire year and that Honda did not compel Takata to complete its investigation any faster were wholly unreasonable and evince recklessness.  Moreover, there was no need for this study in the first place; Honda and Takata already knew the airbags were defective.

f.      On September 16, 2009, Honda and Takata jointly drafted a letter to NHTSA's ODI in response to the ODI's request additional information concerning safety

- 45 -

recall 09V-259.  The ODI had requested an explanation about why Honda's recall on February 9, 2010 (Recall No. 09V-259, 4,000 vehicle) had expanded by almost 100-fold the number of vehicles recalled on November 11, 2008 (Recall No. 08V-593, 379,000 vehicles).  Although signed by Honda's managing counsel, the letter clearly indicates joint drafting, as it is written in the "we" form and defines "we" as "Honda and TK Holding, Inc."  In spite of what Honda and Takata both knew by this time, the letter asserts that the defects were from a limited production run and were caused by a lone faulty high-compression production press.  The letter did not mention the welding and numerous other manufacturing and quality-control problems that Takata's Monclova plant had been suffering for years; nor did it mention Takata's secret airbag tests in 2004.  Thus, Honda and Takata, in concert, knowingly and consciously omitted and withheld crucial information from government regulators in order to prevent regulatory action that likely would have resulted in a broader recall and possibly regulatory sanctions.

g.     Honda and Takata have jointly settled at least one personal injury lawsuit arising from an exploding airbag.  On May 20, 2010, Kristy Williams filed a personal injury action against both Honda and Takata in Georgia State Court in Clayton County, Georgia.[35]  Shrapnel from an exploding Takata airbag in Ms. Williams's 2001 Honda Civic severed her carotid artery, and she survived only because she applied pressure with her fingers to stem the arterial bleeding.  Honda and Takata entered into a confidential settlement with Ms. Williams, and the case was dismissed without prejudice in January 2011.  This settlement demonstrates collaboration, coordination, and information sharing between Honda and Takata, the joint desire to conceal the existence of the exploding-

---

[35] Case No. 2010-CV-04232-MG.

airbag defect and the risks posed by it from regulators and from the public, and joint action to achieve that end. Although this lawsuit occurred after the recent wave of recalls began in November 2008, the suit preceded the massive Honda recall expansions of December 2011 (Recall No. 11V-260), April 2013 (Recall No. 13V-132), and June 2014 (Recall Nos. 14V-349, 14V-351, and 14V-353).

h.      In September 2011, Honda and Takata initiated a joint analysis into an "outside of range" incident that occurred on August 1, 2011.

i.      At no point did either Takata or Honda "break rank" with the other to give a full reporting to government regulators or to the public, even though several people had been killed and dozens injured. Only when backed against the proverbial wall did they start to release a trickle of information, leading to a series of seemingly ever-expanding recalls, commencing in November 2008 and continuing to the present.

188.    Honda and Takata were directly engaged in the production and distribution of goods (vehicles and their constituent parts) in interstate commerce. The enterprise, and the predicate acts of racketeering described below, affected interstate commerce by, among other things, artificially inflating the value of the Defective Vehicles across the country, reducing the resale value of the Defective Vehicles across the country, and providing false and/or fraudulent information to the federal agency charged with regulating automobile safety—NHTSA. In addition, Honda and Takata used the mail and interstate wires to commit the predicate acts described below.

189.    Honda and Takata agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiff and Class Members. Specifically:

a.      Honda, as an automobile manufacturer, has the statutory duty to promptly disclose and remedy defects.

b.      In addition, Honda, because it possesses superior knowledge about the safety, quality, and reliability of its vehicles, owes vehicle owners and lessees the duty to promptly disclose and remedy defects.  Here, Honda obtained that information in part from its collaboration with Takata.

c.      In 2004, Honda submitted an Early Warning Report ("EWR") to NHTSA following the explosion of an airbag in Alabama in a 2002 Honda Accord, yet the EWR fraudulently omitted that airbags posed a risk of explosion.  Had NHTSA, and by extension the public, had complete information, it could have taken appropriate steps to protect the public.  Upon information and belief, the EWR was submitted via the mail or interstate wires.

d.      Likewise, between February 2007 and June 2007, Honda became aware of three injurious airbag ruptures and settled all three out-of-court.  Yet the related EWRs did not state that airbags posed a risk of explosion.  Again, NHTSA and the public were fraudulently deprived of complete information.

e.      On October 2, 2008, Takata made a PowerPoint presentation to Honda, which purportedly contains all of Takata's analysis and testing that led to safety recall 08V-593 on November 11, 2008.  However, the content of this PowerPoint is unknown, as the publicly-available version is redacted,  implying that the information they were sharing was damaging to one or both of them.

f.      On November 11, 2008, Honda recalled approximately 4,000 vehicles (Recall No. 08V-593).  In the regulatory filing, Honda's chronology begins in June 2007,

even though Honda was aware of injuries from as far back as 2004 (including the Alabama explosion in 2004 and the three injury claims settled out-of-court), amounting to a misleading omission of material information.

g.      In December 2008, Honda sent letters to vehicle owners affected by recall number 08V-953, stating that "[m]etal fragments could pass through the airbag cushion material, possibly causing injury to vehicle occupants."  Although a true statement, the letter does not sufficiently communicate the severity of the threat to life and limb. Owners are merely advised to make an appointment to have their vehicle repaired, with no sense of urgency.  In contrast, on October 22, 2014, NHTSA urged affected vehicle owners to "act immediately on recall notices to replace defective Takata airbags."

h.      On June 23, 2009, Honda expanded the previous recall by nearly 100-fold (Recall No. 09V-259).  In the regulatory papers, Honda stated "[t]he VIN range reflects all possible vehicles that could potentially experience the problem."  In light of the 100-fold recall expansion, and what Plaintiff believes Honda knew about Takata's internal difficulties dealing with the recall, this absolutist statement was reckless at best.  Honda's chronology lists three "unusual deployments"—a euphemistic way of describing Ashley Parham's death in May 2009, Jennifer Griffin's shrapnel injuries in June 2009, and one other incident.  This regulatory filing was misleading and served to conceal and/or minimize the threats posed by the airbag defect.

i.      As with the previous recall, Honda's letter to owners and lessees for safety recall 09V-259 did not express the necessary urgency to obtain repairs.

j.      On September 16, 2009 Honda replied to NHTSA's August 19, 2009 request for information concerning safety recalls 08V-593 and 09V-259.  As discussed

- 49 -

above, this letter was co-drafted with Takata.  NHTSA wanted to know why the first

recall did not include the vehicles covered by the second recall.  Among other things,

Honda and Takata explained that several "additional deployments" had occurred outside

of the VIN ranges of the first recall, prompting the latter recall.  But Honda and Takata

fraudulently omitted that one of those deployments caused Ashley Parham's death.  Also,

Honda and Takata explained that the manufacturing problem was limited to only one

high-precision compression press.  Because Takata was by then aware of the litany of

problems plaguing its Monclova, Mexico plant, this explanation was grossly self-serving

for both Honda and Takata.  In addition to the manufacturing problems stated above,

during 2005 and 2006, Takata engineers struggled on three occasions to eliminate leaks

found in inflators in the Monclova plant.  In 2005 Shainin, an outside consultant, found a

pattern of bad welding in the inflators.  It is certainly plausible that moisture entered

some inflators that were unsealed because of bad welds.  Furthermore, Takata and Honda

omitted the existence of the secret testing in 2004 and the negative results of those tests.

Once again, NHTSA, and by extension the public, were deprived of accurate and

complete information.  In part as a result of this letter, the ODI closed its investigation

into these two recalls.

       k.     On February 9, 2010, Honda ordered yet another recall (no. 10V-041,

379,000 vehicles).  For the third time, Honda misleadingly assured NHTSA and the

public that "[t]he VIN range reflects all possible vehicles that could potentially

experience the problem."  Honda's "chronology" is false and misleading because it did

not mention any injuries.  Honda's explanation of the defect—that two processes were

used to prepare the inflator propellant and that one of them was not within

specifications—was misleading in light of what Honda knew, or at least should have known in the exercise of due diligence, about the plethora of problems at Takata's Monclova plant.

l.      Once again, Honda's notification letter to owners and lessees was misleading as it failed to raise the proper urgency.

m.      On February 19, 2010, Takata responded to the ODI's November 20, 2009 letter seeking more information about recalls 08V-593 and 09V-259 conducted by Honda.  Takata falsely and misleadingly asserted that it "ha[d] not provided any air bag inflators that are the same or substantially similar to the inflators in vehicles covered by recalls 08V-593 and 09V-259 to any customers other than Honda."  This statement was patently incorrect, as over 10 manufacturers have recalled vehicles for the Takata exploding-airbag defect.

n.      Also in the February 19, 2010 letter, Takata repeated the assertion that a lone defective compression press caused the defect, omitting the material information about the nearly countless manufacturing and quality-control problems at its Monclova plant, including weld problems leading to unsealed inflator modules.  The existence of unsealed modules is especially dangerous, as Takata itself admits in this letter that elevated propellant moisture levels are a key causal factor of "energetic combustion," and it stands to reason that moisture is more likely to enter an unsealed inflator module.

o.      Also in the February 19, 2010 letter, Takata stated that "throughout the period when the propellant tablets for the Honda inflators were being produced, Takata maintained a policy of continuous review and continuous improvement of its production methods to improve quality and to increase efficiency."  Takata misleadingly omitted,

however, that (1) between 2001 and 2003, its own internal reports titled "Potential Failures" showed at least 45 different inflator manufacturing problems; (2) in 2002, its Monclova plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times above Takata's quality control limit; (3) between 2005 and 2006, Takata engineers struggled, on at least three occasions, to eliminate leaks found in inflators made in Monclova; (4) in 2005, an outside consultant (Shainin) found a pattern of bad welding in the inflators; and (5) in the summer of 2004, it had performed secret tests showing that the inflators were defective, and had ordered the results of those tests destroyed.

p.      Whether Takata was entirely forthcoming with material information in the February 19, 2010 letter is highly questionable, given that on October 30, 2014, NHTSA issued a special order demanding Takata's records regarding the production, testing and subsequent concerns raised internally and by automakers over the airbags, and communications between Takata and automakers about defect concerns.  In addition, the United States Attorney for the Southern District of New York has initiated a criminal investigation into the Takata air bag defects, and a federal grand jury has subpoenaed Takata's U.S. unit to produce documents on the airbag defects.

q.      In March 2010, BMW asked Takata whether any of the airbags that Takata had provided to BMW were defective.  Takata responded in the negative, asserting that BMW's airbags were produced on a different production schedule and thus unaffected.  Takata's response was reckless because by this time, it was aware of the significant manufacturing problems at its Monclova plant, as described above.  BMW was deprived of information upon which proper safety decisions could have been made.

BMW contemporaneously reported this information to NHTSA; thus NHTSA, and by extension the public, were deprived of material, safety-related information.

r.      On May 6, 2010, NHTSA closed its investigation into recalls 08V-593 and 09V-259, citing "insufficient information to suggest that Honda failed to make timely defect decisions on information it was provided [by Takata]."  The closure demonstrates NHTSA's reliance on the false and misleading information provided by Honda and Takata during this investigation.

s.      On April 27, 2011, Honda recalled 2,430 more vehicles for the airbag defect (no. 11V-260), again misleadingly stating that the recall covered "all possible vehicles" with the problem.  As before, the letter to owners and lessees did not sufficiently raise a sense of urgency.  On December 1, 2011, Honda expanded the recall to approximately 273,000 vehicles, demonstrating the recklessness of repeatedly stating that each recall covers "all possible vehicles" with defective airbag inflators.

t.      Subsequent Honda recalls followed the same pattern of misleadingly omitting material information, including the recalls on April 10, 2013 (no. 13V-132), June 19, 2014 (nos. 14V-349, 14V-351, and 14V-353).

u.      On June 11, 2014, Takata sent a letter to the ODI titled "Takata Support for Regional Field Actions to Address Potential Inflator Issues."  Takata explained that it would "support the replacement of the identified inflators in vehicles in Puerto Rico, Florida, Hawaii, and the Virgin Islands, based on the high levels of absolute humidity in those areas," because "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico."  Takata misleadingly omitted Ashely Parham's death in

Oklahoma in May 2009, Gurjit Rathore's death in December 2009 in Virginia, and

Brandi Owens's injury in October 2013 in Georgia.

190.    Pursuant to and in furtherance of their fraudulent scheme, Honda and Takata

committed multiple related acts of mail fraud and/or wire fraud in violation of 18 U.S.C. §§ 1341

and/or 1343.

191.    The acts set forth above constitute a pattern of racketeering activity pursuant to

18 U.S.C. § 1961(5), in that they occurred over a substantial period of time and there is a

substantial threat that the activities will continue in the future because Honda and Takata still

have not provided a full accounting of their defect-related conduct.  Evidence of this incomplete

accounting was made available on November 6, 2014 in *The New York Times*, when yet more

revelations of defect testing—and the subsequent destruction of the testing results—were

revealed.[36]

192.    As a direct and proximate result of Honda's and Takata's racketeering

activities and violations of 18 U.S.C. § 1962(c), Plaintiff and Class Members have been injured

in their business and/or property in multiple ways, including but not limited to:

      a.    overpayment for leased or purchased Defective Vehicles, in that Plaintiff

and Class Members paid for vehicles with safe airbag systems and obtained vehicles with

anything but;

      b.    the Defective Vehicles' value has diminished, thus reducing their resale

value;

      c.    Payment of deductibles when insurance paid to repair damages caused by

the defective airbags;

---

[36] Hiroko Tabuchi, *Takata Saw and Hid Risk in Airbags in 2004, Former Workers Say*, THE NEW YORK TIMES, Nov. 6, 2014, *available at* http://nyti.ms/1psPNw1.

      d.      Payment for alternative transportation during the period between becoming aware of the life-threatening defect and obtaining repairs; and

      e.      Loss of employment due to lack of transportation.

193.      Had Takata and/or Honda been entirely forthcoming with NHTSA and with the public in a timely manner about the vast scope of the inflator defect and the grave risks it posed to countless vehicle occupants, as was their duty, Plaintiff and Class members would not have suffered these harms.  Takata's and Honda's commissions of mail fraud and/or wire fraud were reasonably calculated to deceive persons of ordinary prudence and comprehension, and were committed with reckless indifference to the truth if not the outright intent to deceive.

194.      Honda's and Takata's acts of mail fraud and wire fraud were committed with the specific intent to defraud, thereby entitling Plaintiff and Class Members to treble damages under 18 U.S.C. § 1964(c).

195.      Honda's and Takata's acts of mail fraud and wire fraud were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being to enrich Honda and Takata. Honda's and Takata's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

196.      Plaintiff and Class Members could not have discovered the facts necessary to bring a RICO claim because of Honda's and Takata's mail fraud, wire fraud, and other conduct concealing their knowledge of the true scope of the defective airbag problems and the risks posed to vehicle occupants thereby, amounting to fraudulent concealment and tolling the applicable statute of limitations.

**FOURTH CLAIM FOR RELIEF**
**Fraud, Deceit, and Concealment**
**Cal. Civil Code §§ 1709, 1710, 1711**
**(Brought on behalf of the Nationwide Class against the Honda Defendants)**

197.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint, as if fully set forth herein.

198.     Plaintiff brings this Claim for Relief on behalf of the Nationwide Class against the Honda Defendants (collectively referred to in this Claim for Relief as "Defendants").

199.     At all relevant times, Defendants willfully deceived, fraudulently concealed, and/or failed to disclose to or warn Plaintiff and Class Members of the true facts concerning the safety of the Defective Vehicles and Takata airbags, which the Defendants had a duty to disclose.

200.     Defendants were under a duty to Plaintiff and Class Members to disclose and warn of the defective nature of the Defective Vehicle and/or Takata airbags because: (1) Defendants were in a superior position to know the true state of the facts about the hidden defects in the Defective Vehicles and/or Takata airbags, and those defects were latent; (2) Defendants made incomplete representations about the safety and quality of the Defective Vehicles and/or Takata airbags while not revealing their true defective nature; and (3) Defendants fraudulently and affirmatively concealed the defective nature of the Defective Vehicles and/or Takata airbags from Plaintiff and Class Members.

201.     The facts concealed and/or not disclosed by Defendants to Plaintiff and Class members were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or operate the Defective Vehicles.

202.     At all times relevant hereto, Defendants, and each of them, conducted a sales and marketing campaign to promote the sale of the Defective Vehicles and/or Takata airbags.

Defendants willfully deceived Plaintiff, Class Members, NHTSA, and the general public, of the dangers and risks posed by the Defective Vehicles and/or Takata airbags, and of the propensity for the Takata airbags to release shrapnel upon deployment, or otherwise malfunction.

203.    Defendants intentionally concealed and suppressed the true facts concerning the Defective Vehicles and/or Takata airbags with the intent to defraud Plaintiff and Class Members in that Defendants knew that Plaintiff and Class Members likely would not have purchased the Defective Vehicles and/or Takata airbags if they knew of the true facts.

204.    As a result of the foregoing fraudulent and deceitful conduct by Defendants, Plaintiff and Class Members suffered injuries in fact, and actual damages.

205.    By reason of the foregoing, Plaintiff and Class Members are entitled to judgment against each Defendant, individually, jointly and severally for general, compensatory, and special damages in a sum according to proof at the time of trial as well as punitive damages, together with interest, costs of suit, attorneys' fees and all such other and further relief as the Court deem proper.

**FIFTH CLAIM FOR RELIEF**
**Violation of the Consumer Legal Remedies Act**
**Cal. Civil Code § 1750 *et seq.***
**(Brought on behalf of the Nationwide Class against the Honda Defendants)**

206.    Plaintiff brings this Claim for Relief on behalf of the Nationwide Class against the Honda Defendants (collectively referred to in this Claim for Relief as "Defendants").

207.    This Claim for Relief seeks injunctive relief against Defendants under the California Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* and Cal. Civ. Code § 1782(d).

208.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

209.     Defendants are "persons" under Cal. Civ. Code § 1761(c).

210.     Plaintiff and Class Members are "consumers," as defined by Cal. Civ. Code § 1761(d), who purchased or leased one or more Defective Vehicles.

211.     The CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"  Cal. Civ. Code § 1770(a).  Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below, by among other things, representing that Defective Vehicles and/or Takata airbags have characteristics, uses, benefits, and qualities which they do not have; representing that Defective Vehicles and/or Takata airbags are of a particular standard, quality, and grade when they are not; advertising Defective Vehicles and/or Takata airbags with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving Defective Vehicles and/or Takata airbags has been supplied in accordance with a previous representation when it has not.

212.     In the course of their business, Defendants willfully failed to disclose and actively concealed the dangers and risks posed by the Takata airbags in the Defective Vehicles as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Defective Vehicles.  Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA. Defendant parent companies are also liable for their subsidiaries' violation of the CLRA, because

- 58 -

the subsidiaries act and acted as the parent companies' general agents in the United States for purposes of sales and marketing.

213.     As alleged above, Defendants knew of dangers and risks posed by the Takata airbags, while Plaintiff and Class Members were deceived by Defendants' omissions into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

214.     Defendants knew or should have known that their conduct violated the CLRA.

215.     As alleged above, Defendants made material statements about the safety and reliability of Defective Vehicles that were either false or misleading.

216.     Defendants engaged in a deceptive trade practice when they failed to disclose material information concerning the Defective Vehicles and/or Takata airbags, which they knew at the time of the sale or lease.  Defendants deliberately withheld the information about the propensity of the Takata airbags to release shrapnel upon deployment, or otherwise malfunction, in order to ensure that consumers would purchase their vehicles, and to induce the consumer to enter into a transaction.

217.     To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Takata airbags and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Defective Vehicles, and allowed all Defective Vehicle owners/lessors to continue driving highly dangerous vehicles.

218.     Defendants each owed Plaintiff and Class Members a duty to disclose the dangers and defective nature of the Defective Vehicles, and/or dangers and risks posed by the

- 59 -

Takata airbags, including the dangerous risk that the Takata airbags will release shrapnel upon deployment, or otherwise malfunction, because Defendants:

      a.     Possessed exclusive knowledge of the defects rendering Defective Vehicles and/or Takata airbags inherently more dangerous and unreliable than similar vehicles;

      b.     Intentionally concealed the hazardous situation with Defective Vehicles and/or Takata airbags through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Plaintiff and Class Members; and/or

      c.     Made incomplete representations about the safety and reliability of Defective Vehicles and/or Takata airbags, while purposefully withholding material facts from Plaintiff and Class Members that contradicted these representations.

219.    The Defective Vehicles and/or Takata airbags posed and/or pose an unreasonable risk of death or serious bodily injury to Plaintiff and Class Members, passengers, other motorists, pedestrians, and the public at large, because the Takata airbags are susceptible to releasing shrapnel upon deployment or other malfunctions.

220.    The Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiff and Class Members, about the true safety and reliability of Defective Vehicles and/or Takata airbags.  The Defendants intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with an intent to mislead Plaintiff and Class Members.

221.    Defendants have also violated the CLRA by violating the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle

owners, purchases, dealers, and NHTSA of the defective Takata airbags, and remedying the defects.

222.     Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

223.     Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

224.     Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include:  the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect.  49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

225.     The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.  49 C.F.R. § 276.6(b) & (c).

226.     The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government.  The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000." 49 C.F.R. § 578.6(c).

227.     Defendants engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.* by failing to disclose and by actively concealing dangers and risks posed by the Takata airbags, by selling vehicles while violating the TREAD Act, and by other conduct as alleged herein.

228.     Defendants knew that the Takata airbags contained a defect that could cause the airbags release shrapnel upon deployment, or otherwise malfunction, but Defendants failed for many years to inform NHTSA of this defect.  Consequently, the public, including Plaintiff and Class Members, received no notice of the defects in the Takata airbags.  Defendants failed to inform NHTSA or warn Plaintiff, Class Members, and the public about these inherent dangers, despite having a duty to do so.

229.     Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Class Members, about the true safety and reliability of the Defective Vehicles and/or Takata airbags.

230.     The propensity of the Takata airbags to release shrapnel upon deployment, or otherwise malfunction in the Defective Vehicles, was material to Plaintiff and Class Members. Had Plaintiff and Class Members known that their vehicles had these serious safety defects, they would either not have purchased or leased their Defective Vehicles, or would have paid less for them than they did.

231.     All Class Members suffered ascertainable loss caused by the Defendants failure to disclose material information.  The Class Members overpaid for their vehicles and did not receive the benefit of their bargain.  The value of the Defective Vehicles has diminished as the result of the safety defects posed by the Takata airbags, and Defendants' concealment of, and failure to remedy the defects.

232.     Plaintiff and Class Members have been proximately and directly damaged by Defendants' misrepresentations, concealment, and non-disclosure of the defects in the Defective Vehicles and/or Takata airbags.   They own and lease vehicles whose value has greatly diminished. The diminishment of the Defective Vehicles' value was only exacerbated by Defendants' failure to timely disclose and remedy the dangers and risks posed by the Takata airbags.  Defendants' egregious and widely-publicized conduct, and the piecemeal and serial nature of Defendants' recalls have so tarnished the Defective Vehicles that no reasonable consumer would purchase them-let alone pay what would otherwise be fair market value for the vehicles.

233.     Plaintiff and Class Members risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiff and Class Members, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

234.     The recalls and repairs instituted by Defendants have not been adequate.  The recall is not an effective remedy and is not offered for all Defective Vehicles and other vehicles with Takata airbags susceptible to the malfunctions described herein.  Moreover, Defendants' failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to Plaintiff and Class Members.

235.     As a direct and proximate result of Defendants' violations of the CLRA, Plaintiff and Class Members have suffered injury-in-fact and/or actual damage and, if not stopped, will continue to harm Class Members.  Plaintiff and Class Members currently own or lease, or within the class period have owned or leased, Defective Vehicles that are defective and inherently unsafe.  Plaintiff and Class Members risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiff and Class Members, as well as to the general public.

236.     Plaintiff, on behalf of himself and for all those similarly situated, demands judgment against Defendants under the CLRA for an injunction requiring Defendants to adequately and permanently repair the vehicles, or provide a suitable alternative, free of charge, and an award of attorneys' fees pursuant to Civil Code § 1780(d).  Plaintiff seeks this injunctive relief for Defendants' myriad violations of the CLRA, including Cal. Civ. Code §§ 1770(a)(5), (7), and (9).

237.     On information belief, plaintiffs in parallel litigation in the United States District Court for the Central District of California have served Defendants with a notice of Defendants' alleged violations of California Civil Code § 1770(a), relating to the Defective Vehicles purchased by Plaintiff and Class Members, in the form a letter sent on or about November 6, 2014.  If Defendants fail to correct or agree to correct their actions within thirty days as described therein, Plaintiff will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiff and Class Members are entitled.

### SIXTH CLAIM FOR RELIEF
**Violations of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(Brought on behalf of the Nationwide Class against the Honda Defendants)**

238.     Plaintiff brings this Claim for Relief on behalf of the Nationwide Class against the Honda Defendants (collectively referred to in this Claim for Relief as "Defendants").

239.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

240.     California Business and Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising. . . ."  Defendants engaged in conduct that violated each of this statute's three prongs.

241.     Defendants committed an unlawful business act or practice in violation of § 17200 by their violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth above, by the acts and practices set forth in this Complaint.

242.     Defendants also violated the unlawful prong because it has engaged in violations of National Traffic and Motor Vehicle Safety Act of 1996, codified at 49 U.S.C. § 30101, *et seq.*, and its regulations.

243.     Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related.  *See* 49 C.F.R. § 573.6.

244.     Defendants violated the reporting requirements of FMVSS 573 requirement by failing to report the airbag defect or any of the other dangers or risks posed by the Takata airbags within five days of determining the defect existed, and failing to recall all affected vehicles.

245.     Defendants violated the common-law claim of negligent failure to recall, in that Defendants knew or should have known that the Defective Vehicles and/or Takata airbags were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; Defendants became aware of the attendant risks after the Defective Vehicles were sold; Defendants continued to gain information further corroborating the defects and dangers posed by the Takata airbags; and Defendants failed to adequately recall the Defective Vehicles and/or Takata airbags in a timely manner, which failure was a substantial factor in causing harm to Plaintiff and Class Members, including diminished value and out-of-pocket costs.

246.     Defendants committed unfair business acts and practices in violation of § 17200 when it concealed the existence and nature of the defects, dangers, and risks posed by the Takata airbags.  Defendants represented that vehicles containing Takata airbags were reliable and safe when, in fact, they are not.  The Takata airbags present safety hazards for occupants of vehicles in which they are installed.

247.     Defendants also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Defendants' vehicles with the Takata airbags.  As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the defects, and have been plagued with shortages of replacement parts, as well as a paucity of loaner vehicles available for Class Members whose vehicles are in the process of being repaired.

248.     Defendants violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

249.     Defendants committed fraudulent business acts and practices in violation of § 17200 when they concealed the existence and nature of the defect, dangers, and risks posed by the Takata airbags, while representing in their marketing, advertising, and other broadly disseminated representations that the vehicles containing Takata airbags were reliable and safe when, in fact, they are not.  Defendants' representations and active concealment of the dangers and risks posed by the Takata airbags are likely to mislead the public with regard to the true defective nature of the Defective Vehicles and other vehicles with Takata airbags.

250.     Defendants have violated the unfair prong of § 17200 because of the acts and practices set forth in the Complaint, including the manufacture and sale of vehicles with the Takata airbags, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because of the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiff and Class Members from making fully informed decisions about whether to purchase or lease Defective Vehicles and/or the price to be paid to purchase or lease Defective Vehicles.

251.     Plaintiff and Class Members have suffered injuries in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices.  As set forth above, each Class Member, in purchasing or leasing their vehicles, relied on the misrepresentations and/or omissions of Defendants with respect of the safety and reliability of the vehicles.  Defendants' representations turned out not to be true.  Had Plaintiff and Class Members known this, they would not have purchased or leased their Defective Vehicles and/or paid as much for them.

- 67 -

252.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

253.     As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiff and Class Members have suffered and will continue to suffer actual damages.

254.     Plaintiff and Class Members request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

255.     Plaintiff and Class Members also request equitable and injunctive relief in the form of Court supervision of Defendants' numerous recalls of the various Defective Vehicles, to ensure that all affected vehicles are recalled and that the recalls properly and adequately cure the dangers and risks posed by the Takata airbags.

**SEVENTH CLAIM FOR RELIEF**
**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(Brought on behalf of the Nationwide Class against the Honda Defendants)**

256.     Plaintiff brings this Claim for Relief on behalf of the Nationwide Class against the Honda Defendants (collectively referred to in this Claim for Relief as "Defendants").

257.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

258.     California Business and Professions Code § 17500 states:  "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or

cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading. . . ."

259.    Defendants caused statements to be made or disseminated through California and the United States, through advertising, marketing and other publications, that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to the Defendants, to be untrue and misleading to consumers, Plaintiff, and Class Members.

260.    Defendants violated California Business and Professions Code § 17500 because the misrepresentations and omissions regarding the safety and reliability of their vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

261.    Plaintiff and Class Members have suffered injuries in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their vehicles, Plaintiff and Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of their vehicles.  Defendants' representations turned out not to be true. Had Plaintiff and Class Members known this, they would not have purchased or leased the Defective Vehicles and/or paid as much for them.

262.    Accordingly, Plaintiff and Class Members overpaid for the Defective Vehicles and did not receive the benefit of their bargain.  One way to measure this overpayment, or lost benefit of the bargain, at the moment of purchase is by the value consumers place on the vehicles

- 69 -

now that the truth has been exposed.  Both trade-in prices and auction prices for Defective Vehicles have declined as a result of Defendants' misconduct.  This decline in value measures the overpayment, or lost benefit of the bargain, at the time that Plaintiff and Class Members acquired the Defective Vehicles.

263.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

264.     Plaintiff and Class Members request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices, and for such other relief set forth below.

### EIGHTH CLAIM FOR RELIEF
**Negligent Failure to Recall**
**(Brought on behalf of the Nationwide Class against the Honda Defendants)**

265.     Plaintiff brings this Claim for Relief on behalf of the Nationwide Class against the Honda Defendants (collectively referred to in this Claim for Relief as "Defendants").

266.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

267.     Defendants knew or reasonably should have known that the Defective Vehicles and/or Takata airbags were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

268.     Defendants either knew of the dangers posed by the Takata airbags before the vehicles and/or airbags were sold, or became aware of them and their attendant risks after the vehicles and/or Takata airbags were sold.

269.     Defendants continued to gain information further corroborating the Takata airbag-related dangers, risks and defects from its inception until the present.

270.     Defendants failed to adequately recall the Defective Vehicles, vehicles with Takata airbags, and/or Takata airbags in a timely manner.

271.     Purchasers of the Defective Vehicles, including Plaintiff and Class Members, were harmed by Defendants' failure to adequately recall all the Defective Vehicles and/or Takata airbags in a timely manner and have suffered damages, including, without limitation, damage to other components of the Defective Vehicles caused by the Takata airbag-related defects, the diminished value of the Defective Vehicles, the cost of modification of the dangerous and life-threatening Takata airbags, and the costs associated with the loss of use of the Defective Vehicles.

272.     Defendants' failure to timely and adequately recall the Defective Vehicles was a substantial factor in causing the purchasers' harm, including that of Plaintiff and Class Members.

## NINTH CLAIM FOR RELIEF
### Violations of the Texas Deceptive Trade Practices — Consumer Protection Act
### Tex. Bus. & Com. Code §§ 17.41, *et. seq.*
### (Brought on behalf of the Texas Class against all Defendants)

273.     Plaintiff brings this claim on behalf of the Texas Statewide Class (the "Texas Class").

274.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

275.     Plaintiff and members of the Texas Class are individuals, partnerships, and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* Tex. Bus. & Com. Code § 17.41,

276.     The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code § 17.45(5); Tex. Bus. & Com. Code § 17.50(a)(3).  Defendants have committed false, misleading, unconscionable and deceptive acts or practices in the conduct of trade or commerce.

277.     Defendants also violated the Texas DTPA by, among other things: (1) representing that the Defective Vehicles and/or Takata airbags have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Defective Vehicles and/or Takata airbags are of a particular standard, quality, and grade when they are not; (3) advertising the Defective Vehicles and/or Takata airbags with the intent not to sell them as advertised; and (4) failing to disclose information concerning the Defective Vehicles and/or Takata airbags with the intent to induce consumers to purchase or lease the Defective Vehicles.

278.     In the course of their business, Defendants willfully failed to disclose and actively concealed the dangers and risks posed by the Takata airbag in the Defective Vehicles as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or lease of Defective Vehicles. Defendants are directly liable for engaging in unfair

- 72 -

and deceptive acts or practices in the conduct of trade or commerce in violation of the Texas DTPA.

279.    As alleged above, Defendants knew of the dangers and risks posed by the Takata airbags, while the Texas Class was deceived by Defendants' omissions into believing the Defective Vehicles were safe, and the information could not have reasonably been known by the consumer.

280.    Defendants knew or should have known that their conduct violated the Texas DTPA.

281.    As alleged above, Defendants made material statements about the safety and reliability of the Takata airbags and/or Defective Vehicles that were either false or misleading.

282.    Defendants engaged in a deceptive trade practice when they failed to disclose material information concerning the Defective Vehicles and/or Takata airbags which they knew at the time of the sale/lease. Defendants knew of and deliberately withheld the information about the propensity of the Takata airbags to release shrapnel upon deployment, or otherwise malfunction, in order to ensure that consumers would purchase their vehicles and to induce the consumer to enter into a transaction.

283.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Takata airbags, and their tragic consequences, and allowed unsuspecting new and used car purchasers and lessors to continue to buy/lease the Defective Vehicles and allowed all Defective Vehicle owners/lessors to continue driving highly dangerous vehicles.

284.    Defendants each owed the Texas Class Members a duty to disclose the defective nature of Defective Vehicles and/or Takata airbags, including the dangerous risk that

the Takata airbags will release deadly shrapnel upon deployment, or otherwise malfunction, because Defendants:

      a.    Possessed exclusive knowledge of the defects rendering Defective Vehicles and/or Takata airbags inherently more dangerous and unreliable than similar vehicles and airbag systems;

      b.    Intentionally concealed the hazardous situation with Defective Vehicles and/or Takata airbags through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from Plaintiff and the Texas Class; and/or

      c.    Made incomplete representations about the safety and reliability of Defective Vehicles and/or Takata airbags, while purposefully withholding material facts from Plaintiff and the Texas Class that contradicted these representations.

285.    The Defective Vehicles and/or Takata airbags posed and/or pose an unreasonable risk of death or serious bodily injury to the Texas Class, passengers, other motorists, pedestrians, and the public at large, because the Takata airbags are susceptible to releasing shrapnel upon deployment or other malfunctions.

286.    Defendants' unfair or deceptive acts or practices were likely and did in fact to deceive reasonable consumers, including the Texas Class, about the true safety and reliability of Defective Vehicles and/or Takata airbags. Defendants intentionally and knowingly misrepresented material facts regarding the Defective Vehicles and/or Takata airbags with an intent to mislead the Texas Class.

287.    The propensity of the Takata airbags to release shrapnel upon deployment, or otherwise malfunction in the Defective Vehicles was material to the Texas Class. Had the Texas

Class Members known that their vehicles had these serious safety dangers, risks, and/or defects, they would either not have purchased their Defective Vehicles, or would have paid less for them than they did.

288.     All members of the Texas Class suffered ascertainable loss caused by Defendants' failure to disclose material information. Texas Class Members overpaid for their vehicles and did not receive the benefit of their bargain. As the result of Defendants' concealment and failure to remedy the serious safety defect, and the piecemeal and serial nature of the recalls, the value of their Defective Vehicles has diminished.  This is particularly true now that the safety issues in the Defective Vehicles and/or Takata airbags have come to light, and Texas Class Members own and lease unsafe vehicles.

289.     Texas Class Members have been proximately and directly damaged by Defendants' misrepresentations, concealment, and non-disclosure of the dangers and risks posed by the Takata airbags in the Defective Vehicles.  Texas Class Members are now holding vehicles whose value has greatly diminished because of Defendants' failure to timely disclose and remedy the serious defects.  Defendants' egregious and widely-publicized conduct, and the piecemeal nature of Defendants' recalls, have so tarnished the Defective Vehicles that no reasonable consumer would purchase them—let alone pay what would otherwise be fair market value for the vehicles.

290.     Plaintiff and Texas Class Members risk irreparable injury as a result of the Defendants' acts and omissions in violation of the Texas DTPA, and these violations present a continuing risk to the Texas Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

291.     The recalls and repairs instituted by Defendants have not been adequate. The recall is not an effective remedy and is not offered for all Defective Vehicles and other vehicles with Takata airbags susceptible to the malfunctions described herein.

292.     As a direct and proximate result of Defendants' violations of the Texas DTPA, Plaintiff and Texas Class Members have suffered injury-in-fact and/or actual damage.

293.     Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), the Texas Class seeks monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

294.     For those Texas Class Members who wish to rescind their purchases, they are entitled under Tex. Bus. & Com. Code § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

295.     The Texas Class also seeks court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

296.     Compliance with the notice requirement as set forth in Tex. Bus. & Com. Code § 17.505(a) is rendered impracticable for several reasons, including the need to file suit before the potential expiration of the statute of limitations.  Nevertheless, Plaintiff and the Texas Class have complied with the notice requirement set forth in Tex. Bus. & Com. Code § 17.505(a) by virtue of the notice provided in the context of the previously filed action styled *Dunn, et al. v. Takata Corporation, et al.*, 1:14-cv-24009-JLK (S.D. FL.), and other similar actions.

297.     Upon filing this Complaint and as required by Tex. Bus. & Com. Code § 17.501, Plaintiff will provide the consumer protection division of the Attorney General's office a copy of this Complaint.

### TENTH CLAIM FOR RELIEF
**Breach of the Implied Warranty Of Merchantability**
**Tex. Bus. & Com. Code § 2.314)**
**(Brought on behalf of the Texas Class against all Defendants)**

298.     Plaintiff brings this claim on behalf of the Texas Class.

299.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint, as if fully set forth herein.

300.     Defendants are merchants with respect to motor vehicles and/or airbags under Tex. Bus. & Com. Code § 2.104.

301.     Under Tex. Bus. & Com. Code § 2.314, a warranty that the Defective Vehicles were in merchantable condition was implied by law in the transactions in which Texas Class Members purchased their Defective Vehicles.

302.     Defendants impliedly warranted that the vehicles and the Takata airbags therein were of good and merchantable quality and fit, and safe for their ordinary intended use—transporting the driver and passengers in reasonable safety during normal operation, and without unduly endangering them or members of the public.

303.     These vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Vehicles are inherently defective in that the Takata airbags therein are at risk of expelling shrapnel upon deployment, or otherwise malfunctioning.

304.     As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Texas Class Members have been damaged in an amount to be proven at trial.

### ELEVENTH CLAIM FOR RELIEF
**Fraud by Concealment**
**(Brought on behalf of the Texas Class against all Defendants)**

305.     In the event that the Court declines to certify a Nationwide Class, Plaintiff

brings this claim on behalf of the Texas Class.

306.     Plaintiff hereby incorporates by reference the allegations contained in the

preceding paragraphs of this Complaint, as if fully set forth herein.

307.     As described above, Defendants made material omissions and affirmative

misrepresentations regarding the Defective Vehicles and/or Takata airbags.

308.     Defendants knew these representations were false when made.

309.     The vehicles purchased or leased by the Texas Class were, in fact, defective,

unsafe, and unreliable, because the vehicles' Takata airbags were subject to releasing shrapnel

upon deployment, or other malfunctions.

310.     Defendants had a duty to disclose that the Defective Vehicles were defective,

unsafe, and unreliable in that it contained dangerous airbag defects, because the Texas Class

relied on Defendants' representations that the vehicles they were purchasing, leasing, and/or

retaining were safe and free from defects.

311.     The aforementioned concealment was material, because if it had been

disclosed, Texas Class Members would not have bought, leased, or retained their vehicles, or

would have paid less for the vehicles.

312.     The aforementioned representations were also material because they were facts

that would typically be relied on by a person purchasing, leasing, or retaining a new or used

motor vehicle. Defendants knew or recklessly disregarded that their representations were false

because Defendants knew that people had died or were injured as the result of the Defective

Vehicles' Takata airbags. Defendants intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

313.     Texas Class Members relied on the Defendants' reputation, along with their failure to disclose the Takata airbag's dangers and problems, and Defendants' affirmative assurance that its vehicles and/or airbags were safe and reliable and other similar false statements, in purchasing, leasing or retaining the Defective Vehicles.

314.     As a result of their reliance, the Texas Class has been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase and/or the diminished value of their vehicles.

315.     Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of the Texas Class. Texas Class Members are therefore entitled to an award of punitive damages.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against the Defendants, as follows:

A.     an order certifying the proposed Classes designating Plaintiff as the named representative of the Classes, and designating the undersigned as Class Counsel;

B.     a declaration that the airbags in Defective Vehicles are defective;

C.     a declaration that the Defendants are financially responsible for notifying all Class Members about the defective nature of the Defective Vehicles;

D.     an order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Defective Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Defective Vehicles to eliminate the

defective airbags;

E.      an award to Plaintiff and Class Members of compensatory, exemplary, and statutory penalties, damages, including interest, in an amount to be proven at trial;

F.      an award to Plaintiff and Class Members for the return of the purchase prices of the Defective Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

G.      a Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket expenses and damages claims associated with the Defective Airbags in Plaintiff's and Class Members' Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

H.      a declaration that the Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits it received from the sale or lease of the Defective Vehicles, or make full restitution to Plaintiff and Class Members;

I.      an award of attorneys' fees and costs, as allowed by law;

J.      an award of prejudgment and postjudgment interest, as provided bylaw;

K.      leave to amend this Complaint to conform to the evidence produced at trial; and

L.      such other relief as may be appropriate under the circumstances.

Dated: November 25, 2014        Respectfully submitted,

THE LANIER LAW FIRM, P.C.

By: */s/ W. Mark Lanier*
     W. Mark Lanier

W. Mark Lanier – Attorney in Charge
State Bar No.: 11934600
Federal I.D. 8461
Eugene R. Egdorf
State Bar No.: 06479570
Federal I.D. 14112
**THE LANIER LAW FIRM, P.C.**
6810 FM 1960 West (77069)
Houston, Texas 77269-1448
Telephone: (713) 659-5200
Fax: (713) 659-2204
Direct Fax: (281) 866-6963

Bradley L. Leger
State Bar No.: 24039899
Southern District of Texas Bar No.: 38360
**LEGER ADKINS LLP**
2323 S. Shepherd Drive, Suite 915
Houston, TX 77019-7028
Telephone: (713) 574-5558
Fax: (713) 574-1894

*Attorneys for Plaintiff Monte Leger, individually and on behalf of all others similarly situated*

1207355.1

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Dated: November 25, 2014   Respectfully submitted,

THE LANIER LAW FIRM, P.C.

By:  */s/ W. Mark Lanier*
   W. Mark Lanier

W. Mark Lanier – Attorney in Charge
State Bar No.: 11934600
Federal I.D. 8461
Eugene R. Egdorf
State Bar No.: 06479570
Federal I.D. 14112
**THE LANIER LAW FIRM, P.C.**
6810 FM 1960 West (77069)
Houston, Texas 77269-1448
Telephone: (713) 659-5200
Fax: (713) 659-2204
Direct Fax: (281) 866-6963

Bradley L. Leger
State Bar No.: 24039899
Southern District of Texas Bar No.: 38360
**LEGER ADKINS LLP**
2323 S. Shepherd Drive, Suite 915
Houston, TX 77019-7028
Telephone: (713) 574-5558
Fax: (713) 574-1894

*Attorneys for Plaintiff Monte Leger, individually and on*
*behalf of all others similarly situated*

1207355.1